UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
TASHENA AMPRATWUM and ERIC FISHER,      :
                                        :
                    Plaintiffs,         :       11 Civ. 6111 (DLC)
                                        :
        -v-                             :       OPINION & ORDER
                                        :
CITY OF NEW YORK, et al.,               :
                                        :
                    Defendants.         :
                                        :
----------------------------------------X

For Plaintiffs:

Tashena Ampratwum, pro se
3051 Gunther Avenue
Bronx, NY 10469

Eric Fisher, pro se
1173 East 229 St Drive North, Apt. 3A
Bronx, NY, 10466

For Defendants:

Michael A. Cardozo
Uriel B. Abt
New York City Law Department
100 Church Street
New York, NY 10007

DENISE COTE, District Judge:

    Plaintiffs Tashena Ampratwum ("Ampratwum") and Eric Fisher

("Fisher"), proceeding pro se, brought this action pursuant to

42 U.S.C. § 1983 for a number of constitutional violations

allegedly committed by the defendants in connection with

Ampratwum's arrest in July 2009, including false arrest, false

imprisonment, malicious prosecution, damage to private property, obstruction of Freedom of Information Law ("FOIL") requests, falsifying records, and conspiracy to commit fraud. Following the close of discovery, on January 2, 2013, plaintiffs filed a motion for summary judgment in this action "against all defendants who willfully committed fraud in-order to conduct their false arrest and imprisonment against the plaintiffs' secured civil rights." On January 4, plaintiffs filed a second motion for summary judgment "against defendants who lacked probable cause to arrest plaintiffs." On January 8, defendants moved for summary judgment on all claims.[1] On February 1, plaintiffs also moved to strike defendant P.O. Denise Enmanuel's ("Enmanuel") affidavit submitted in support of defendants' summary judgment motion. Having reviewed the parties' submissions,[2] the defendants' motion for summary judgment is

---

[1] Summary judgment may not be entered against pro se plaintiffs unless they have received notice of their obligations to oppose the summary judgment motion. See Irby v. N.Y. City Transit Auth., 262 F.3d 412, 414 (2d Cir. 2001); Vital v. Interfaith Med. Ctr., 168 F.3d 615, 620-21 (2d Cir. 1999). To that end, the Court provided plaintiffs with a "Notice For Pro Se Litigants Regarding Opposition to a Summary Judgment Motion" in conjunction with its Scheduling Order of December 7, 2012, and the defendants have certified that they served plaintiffs with copies of the Local Rule 56.2 Notice with their summary judgment materials. Such notice was clearly sufficient to advise plaintiff of her burden to oppose the defendants' summary judgment motion.

[2] On January 28, 2013, plaintiffs filed several submissions in opposition to defendants' motion for summary judgment, including

granted, and plaintiffs' motions for summary judgment and motion to strike are denied.

I.  Background

     Unless otherwise noted, the following facts are undisputed, taken from the plaintiffs' depositions, or taken in the light most favorable to the plaintiffs.  In July 2009, Ampratwum lived in a first floor apartment at 3501 Gunther Avenue (the "House") with her children A.A. and F.F., and her sister, Shantel Vernon ("Vernon").  Vernon was sixteen years old at the time, and had lived for over a year with Ampratwum, who served as Vernon's legal guardian.

     On the morning of July 20, 2009, Ampratwum and Vernon had an argument at the House.  At the end of the argument, Vernon walked out.  According to Vernon, Ampratwum told her to leave or otherwise indicated that she "didn't want [her] there."[3]

_____

"Affidavit in Supporting Plaintiffs' Opposition Against Defendants' Summary Judgment Claiming Probable Cause to Arrest Plaintiffs"; "Plaintiffs' Opposition to ACS Defendants' Summary Judgment Due to Lack of Probable Cause"; and "Affidavit in Supporting Plaintiffs' Opposition Against Defendant Rachel Kish-Esq's Summary Judgment."  Defendants filed a reply on February 26.  Defendants filed opposition to plaintiffs' motions for summary judgment on February 13, 2013.  Plaintiffs filed a reply in support of their motions for summary judgment on February 27.

[3] Vernon testified in her deposition that Ampratwum "told [her] to leave, but I think it was like a in the heat of the moment thing and I took it as she didn't want me there so I just left."

Ampratwum, however, alleges that Vernon left by her own accord;
she believed Vernon was "running away."  Vernon did not take her
key to the House with her when she left.  Vernon went to a
friend's home, but attempted to return to the House up to three
times that day to pick up some of her personal items.[4]  Ampratwum
did not let Vernon back in the House at any time, nor did
Ampratwum give Vernon the personal belongings she had come back
to retrieve.  After Vernon left the House, Ampratwum called a
case worker from the New York City Administration for Children's
Services ("ACS" or "ACS Agency"), Nataki Robinson ("Robinson"),
and told Robinson that Vernon had run away.  According to
Ampratwum, Robinson advised her to "make a report" regarding the
incident.

Around 2:00 p.m. on July 20, Vernon's friend called 911.
While speaking with the police, Vernon's friend pretended to be
Vernon, and reported that she had been put out of her home by
her sister, and that her sister would not allow her to return.[5]

---

Police reports indicate that Ampratwum threatened to change the
locks on the House.

[4] Ampratwum testified that Vernon attempted to return "like three
times.  She came separate, and then her friend came separate,
and then they both came back."

[5] Vernon was present when her friend made the call.  Vernon
testified that she did not call the police herself because she
was "scared."

Defendant police officers Enmanuel and P.O. Vargas ("Vargas") responded to the call.  Vernon was sitting alone in front of the House when Enmanuel and Vargas arrived.  Vernon identified herself as the individual who had called 911, and informed the officers that she was sixteen years old and lived with her sister, that Ampratwum was her legal guardian, that Ampratwum told her to leave the House and would not let her back in, and that she "did not want to go back."[6]

A description of the House will be of assistance in understanding the events that followed.  3501 Gunther Avenue is a two-story, two-family house.  Ampratwum occupies the apartment on the first floor, and the building's owner and landlord lives in the second-floor apartment.  The House has only one mailbox, but each apartment has a separate doorbell outside the House's front, or outer, door (the "outer door").  The outer door opens into a small hallway, where there are two doors: one for Ampratwum's first-floor apartment (the "apartment door"), and one leading to the landlord's second-floor apartment.  Ampratwum keeps her apartment door locked, and although she has a key to the landlord's second-floor apartment, Ampratwum generally would

---

[6] At one point that day, Vernon also told the officers that there had been a previous ACS case involving an incident when Ampratwum had hit Vernon in the face and given her a black eye.

not enter the second-floor apartment without her landlord's permission.

After meeting Vernon outside the House, Enmanuel and Vargas approached the House's outer door and spoke to Ampratwum.[7] Ampratwum told Enmanuel and Vargas that she was Vernon's legal guardian, that Vernon left the House after an argument that morning, that she had called Robinson, and that the officers could call Robinson to confirm what she was saying. Ampratwum refused to allow Enmanuel, Vargas, or Vernon to enter the House to collect Vernon's belongings. Ampratwum testified that she also said to the officers, "[Vernon]'s a minor, where is she going to go." According to Ampratwum, one of the officers eventually said that she was "f'ing coming in," after which Ampratwum locked the outer door, returned to her apartment, and locked the apartment door. A domestic incident police report and arrest report from July 20 state that Ampratwum became angry with the police officers, used profanity, and slammed the door on the officers. The officers continued to entreat Ampratwum to let them in through the closed outer door. Enmanuel then forced open the outer door, entered the hallway, and attempted to speak

---

[7] Ampratwum testified that she "came to the front door" when Enmanuel and Vargas approached the House. She first maintained that she did not open the door to speak to Enmanuel and Vargas, but also testified that she "closed [the door] . . . and walked away" from them later in their interaction.

to Ampratwum through her apartment door.  Enmanuel and Vargas never entered Ampratwum's apartment.

Several minutes later, a second set of police officers arrived, including defendant Sgt. Philip Jiminez ("Jiminez").[8] Jiminez identified himself to Ampratwum through the apartment door, and Ampratwum opened the apartment door to speak to him. Plaintiff Eric Fisher ("Fisher"), who was and is romantically involved with Ampratwum and is F.F.'s father, arrived at the house around this time.  Jiminez told Ampratwum and Fisher to "[l]et ACS handle the situation."  Ampratwum claims that no police officers ever entered her apartment, and she spoke to Jiminez in the hallway.  Fisher, however, testified that Ampratwum spoke to Jiminez inside Ampratwum's apartment in the kitchen.  After Jiminez spoke with Ampratwum and Fisher for several minutes, all of the police officers at the scene left the House with Vernon and went to the police station.

Shortly thereafter, Ampratwum and Fisher also went to the police station, intending to file (i) an ACS report as to Vernon's behavior that morning and (ii) a complaint against the police officers for damaging the door.  At the station, they spoke to defendant Lieutenant Kenny ("Kenny") and explained the

---

[8] Ampratwum called 911 for additional help after she heard Enmanuel "kicked in" the outer door; Enmanuel and Vargas called for a supervisor over their radio at roughly the same time.

events of the day, including that Robinson had advised Ampratwum
to report that Vernon "packed her stuff and left" that morning,
and that the police officers kicked in her door.  She also
informed Kenny that she wanted to file both an ACS report and a
complaint against the officers who had come to the House.  After
roughly one hour, Kenny took Ampratwum to a back room and
provided her with paperwork to file a report.  Kenny left the
room, but returned soon after with a second male officer.[9]  Kenny
stated there had been a "change of plans," and at 4:15 p.m.,
Ampratwum was arrested.  The arrest report charges Ampratwum
with violating a local class A misdemeanor and acting in a
manner injurious to a child under the age of seventeen, and
bases the charges on Vernon's statements and the events that the
police officers observed at the House earlier that day.

     Vernon was taken to an ACS facility that evening.[10]  Vernon
later spoke to a prosecutor and recounted the events of July 20,
including that Ampratwum was her legal guardian, and that
Ampratwum had kicked her out of the house and would not allow
her to return to retrieve her belongings.  Based on these
allegations, on July 21, Ampratwum was charged with endangering

---

[9] Ampratwum estimates Kenny came back after two minutes.

[10] Vernon eventually was placed in foster care on a voluntary
placement.  She never returned to live with Ampratwum after July
20, 2009.

8

the welfare of a child, unlawful eviction, and harassment in the second degree in the criminal division of the Bronx Supreme Court (the "State Criminal Action").  Vernon, however, chose not to pursue these criminal charges.[11]

On July 21, Vernon also spoke to an ACS case worker, Michelle Campbell ("Campbell").  Vernon recounted the events of July 20 and also told Campbell that Fisher sometimes stayed with them at the House, that he was the father of F.F., and that he smokes marijuana in the presence of Vernon and the two younger children, A.A. and F.F.  The following day, Campbell filed neglect petitions on behalf of Vernon, A.A., and F.F. with regard to both Ampratwum and Fisher.  F.F. and A.A. were paroled to the custody of Ampratwum and Fisher under certain conditions, including requiring Fisher to submit to drug screening.  On July 29, 2009, Fisher appeared before Judge Roberts of the Bronx County Family Court, who ordered Fisher to submit to a drug test that day.  Fisher refused to take the test.  Over a year later, on August 10, 2010, ACS withdrew the neglect petitions against Ampratwum and Fisher.  Judge Roberts approved the withdrawal and dismissal of the neglect petitions on October 21, 2010.

On July 27, 2009, Ampratwum filed a complaint with the Civilian Complaint Review Board ("CCRB"), alleging that, on July

---

[11] The charges were dismissed on April 10, 2010 on speedy trial grounds for lack of complaining witness contact.

20, Enmanuel spoke to Ampratwum "obscenely and rudely" and damaged Ampratwum's property.  The CCRB recommendation report states that Ampratwum's claims regarding Enmanuel's language were "unsubstantiated" and recommended that the charges regarding damage to the door be "exonerated."

In 2010, plaintiffs filed a civil suit in New York State Civil Court against the defendants in this action, with respect to essentially the same events at issue here (the "State Civil Action").  Judge Reed heard the case.  Defendant Rachel Kish, Esq. ("Kish"), who represented the City as corporation counsel in that action, filed a motion for summary judgment in that matter, which Judge Reed denied.  Ampratwum filed a motion for sanctions against the police officer defendants and Kish in that action, which was also denied.

Plaintiffs filed this action on August 31, 2011, claiming damages against the City of New York (the "City"), the NYPD, Bronx County Judge Robert Reeds [sic], CCRB Agency's Graham Daw-Esq., Kish, Kenny, Jimenez, Sgt. Christine Melhorn ("Melhorn"), Sgt. Menendez ("Menendez"), P.O. Turnase ("Turnase"), Emanuel, and Vargas.  The State Civil Action was discontinued with prejudice on September 23, 2011 in light of this pending federal action.

Plaintiffs filed an amended complaint on October 17, and by Order dated October 19, the Court dismissed all claims against

the NYPD, Judge Reed, and Graham Daw.   Plaintiffs filed their
second amended complaint (the "Complaint") on January 9, 2012
against the current defendants.   After a number of extensions,
the parties' filed their motions for summary judgment, and
plaintiffs filed their motion to strike.

II.  Discussion

The parties have cross-moved for summary judgment on
plaintiffs' claims.   Summary judgment may not be granted unless
all of the submissions taken together "show that there is no
genuine issue as to any material fact and that the movant is
entitled to judgment as a matter of law."   Rule 56(c), Fed. R.
Civ. P.   The moving party bears the burden of demonstrating the
absence of a material factual question, and in making this
determination, the court must view all facts in the light most
favorable to the non-moving party.   Holcomb v. Iona Coll., 521
F.3d 130, 132 (2d Cir. 2008); Eastman Kodak Co. v. Image
Technical Services, Inc., 504 U.S. 451, 456 (1992).

Once the moving party has asserted facts showing that the
non-movant's claims cannot be sustained, the opposing party must
"set out specific facts showing a genuine issue for trial," and
cannot "rely merely on allegations or denials" contained in the
pleadings.   Rule 56(e), Fed. R. Civ. P.; see also Wright v.
Goord, 554 F.3d 255, 266 (2d Cir. 2009).   "A party may not rely

11

on mere speculation or conjecture as to the true nature of the
facts to overcome a motion for summary judgment," as "[m]ere
conclusory allegations or denials cannot by themselves create a
genuine issue of material fact where none would otherwise
exist."  Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)
(citation omitted).  Only disputes over material facts -- "facts
that might affect the outcome of the suit under the governing
law" -- will properly preclude the entry of summary judgment.
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

     In considering the summary judgment motions, the Court
liberally construes all submissions by the pro se plaintiff and
"interpret[s] [them] to raise the strongest arguments that they
suggest."  Triestman v. Fed. Bureau of Prisons, 470 F.3d 471,
474 (2d Cir. 2006) (per curiam) (citation and emphasis omitted).
The application of this forgiving standard for pro se litigants,
however, "does not relieve plaintiff of his duty to meet the
requirements necessary to defeat a motion for summary judgment."
Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)
(citation omitted).

     To sustain claims under 42 U.S.C. § 1983, the plaintiffs
must show that they were "deprived of rights, privileges, or
immunities secured by the Constitution and laws [of the United
States]" by a person acting under color of state law.  Burg v.
Gosselin, 591 F.3d 95, 97 (2d Cir. 2010) (citation omitted); see

12

also Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995) ("Section 1983 is only a grant of a right of action; the substantive right giving rise to the action must come from another source."). Therefore, "the first step in any § 1983 claim is to identify the specific constitutional right allegedly infringed." Pabon v. Wright, 459 F.3d 241, 252-53 (2d Cir. 2006) (citation omitted). The Complaint is construed to reference alleged deprivations of plaintiffs' First, Fourth, and Fourteenth Amendment rights by claiming the defendants subjected them to false arrest, malicious prosecution, retaliation, unlawful entry, and violations of due process. The defendants also construe several claims under New York State law, including conversion, false arrest, false imprisonment, and fraud. The defendants are entitled to summary judgment on all of plaintiffs' claims, each of which will be addressed in turn.

A. Defendants Menendez, Melhorn, Turnage, Kish, the City, and ACS

As a preliminary matter, the defendants contend that all claims against Menendez, Melhorn, and Turnage must be dismissed because the plaintiffs fail to allege that these defendants were personally involved in any of the underlying misconduct. A defendant's conduct must be a proximate cause of the claimed violation in order to find that the defendant deprived the plaintiff of his rights. Martinez v. California, 444 U.S. 277,

285 (1980).  It is "well settled" that "personal involvement of
defendants in alleged constitutional deprivations is a
prerequisite to an award of damages under [Section] 1983."
Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010).  As a
consequence, "the doctrine of respondeat superior . . . does not
suffice to impose liability for damages under [S]ection 1983 on
a defendant acting in a supervisory capacity."  Hayut v. State
Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003); see also
Reynolds v. Giuliani, 506 F.3d 183, 190-191 (2d Cir. 2007)
(discussing municipal liability).  The personal involvement and
liability of supervisory personnel is established when the
supervisory official has "actual or constructive notice of
unconstitutional practices and demonstrates gross negligence or
deliberate indifference by failing to act."  Meriwether v.
Coughlin, 879 F.2d 1037, 1048 (2d Cir. 1989) (citation omitted);
Blyden v. Mancusi, 186 F.3d 252, 265 (2d Cir. 1999).

        All claims against defendants Melhorn, Menendez, and
Turnage must be dismissed since there is no evidence that they
were personally involved in any alleged deprivation of
plaintiffs' rights.  Plaintiffs concede that they have never
seen, met, nor spoken to these officers, and that these
defendants were not present during any of the challenged conduct
that occurred at the House or the precinct on July 20, 2009.
Instead, the plaintiffs only seek to hold Melhorn, Menendez, and

Turnage liable because their names appear on a number of police reports that the plaintiffs believe contain false information.[12] Plaintiffs do not, however, offer any evidence that these defendants were on notice of any false statements in the documents they signed; that they were aware of, indifferent to, or involved in creating a custom or practice giving rise to any unconstitutional conduct; or that they otherwise had personal knowledge or involvement in any violation of the plaintiffs' rights.  Any claims against Melhorn, Menendez, and Turnage are therefore dismissed.  Melhorn, Menendez, and Turnage are also separately entitled to summary judgment on the merits of plaintiffs' fraud claims, as discussed below.

    The defendants also argue that summary judgment must be granted in their favor as to all claims against Kish since she is entitled to absolute immunity while acting in her capacity as assistant corporation counsel.  The absolute immunity accorded to government prosecutors "creates a formidable obstacle for a plaintiff seeking to maintain a civil rights action against a [government] attorney," Pinaud v. Cnty. of Suffolk, 52 F.3d

---

[12] The record includes three police reports stemming from the events of July 20, 2009 relevant to these claims: a Complaint form #2009-047-06601, an Arrest Report, and a NYPD Domestic Incident Report.  All three forms are dated July 20, 2009. Melhorn is listed as "Signoff Supervisor" on the Domestic Incident Report.  Menendez is listed as "Signoff Supervisor" on the Complaint form.  Turnage is listed under the heading "Report Entered By" on both the Arrest Report and Complaint form.

1139, 1147 (2d Cir. 1995), and "encompasses not only their conduct of trials but all of their activities that can fairly be characterized as closely associated with the conduct of litigation or potential litigation." Barrett v. United States, 798 F.2d 565, 571-72 (2d Cir. 1986).  This absolute protection from liability under Section 1983 also "extends to . . . government attorneys defending civil suits." Spear v. Town of West Hartford, 954 F.2d 63, 66 (2d Cir. 1992).  "[O]nce a court determines that challenged conduct involves a function covered by absolute immunity, the actor is shielded from liability for damages regardless of the wrongfulness of his motive or the degree of injury caused." Bernard v. Cnty. of Suffolk, 356 F.3d 495, 503 (2d Cir. 2004).

The Complaint asserts that Kish committed "willful fraud" by submitting a summary judgment motion in the plaintiffs' State Civil Action that included police records containing allegedly false information.  The act of filing a motion for summary judgment, however, falls strictly within the scope of activities protected by the doctrine of absolute immunity.  Accordingly, all claims against Kish are also dismissed.

Finally, the defendants contend that neither ACS nor the City are proper defendants to this action.  ACS and the City are entitled to summary judgment as to all claims against them, for two reasons.  First, ACS is not a suable entity.  N.Y. City

16

Charter, Ch. 24–B, Ch. 17 § 396; see also Ximines v. George
Wingate High Sch., 516 F.3d 156, 160 (2d Cir. 2008) ("Section
396 of the Charter has been construed to mean that New York City
departments, as distinct from the City itself, lack the capacity
to be sued." (citation omitted)).

Second, a municipal entity is not subject to respondeat
superior liability under Section 1983.  Monell v. Department of
Soc. Servs., 436 U.S. 658, 691 (1978).  "To prevail against a
municipality on a § 1983 claim, a plaintiff must demonstrate
both an injury to a constitutionally protected right and that
the injury was caused by a policy or custom of the municipality
or by a municipal official responsible for establishing final
policy." Hartline v. Gallo, 546 F.3d 95, 103 (2d Cir. 2008)
(citation omitted).  The plaintiffs make no such claims.  They
fail to identify any City policy that might have caused an
alleged deprivation of their rights, and fail to allege that any
defendant or other City or ACS official was responsible for
generating any such policy.  All claims against ACS and the City
are therefore dismissed.

B.  False Arrest

Plaintiffs contend that Ampratwum's July 20, 2009 arrest
violated her Fourth Amendment rights.  To establish a claim for
false arrest under Section 1983, a plaintiff must show that "the
defendant intentionally confined him without his consent and

17

without justification." Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004) (citation omitted).  The defendants do not dispute that Ampratwum was arrested, and thus, the only question to be resolved is whether the arrest was supported by probable cause. "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest . . . under § 1983." Jenkins v. City of New York, 478 F.3d 76, 84 (2d Cir. 2007) (citation omitted); Escalera, 361 F.3d at 743 ("Because probable cause to arrest constitutes justification there can be no claim for false arrest where the officer had probable cause to arrest the plaintiff.").

The requirement of probable cause does not create a high bar for law enforcement.  Probable cause exists "when, based on the totality of circumstances, the officer has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." Finigan v. Marshall, 574 F.3d 57, 62 (2d Cir. 2009) (citation omitted). The question of whether probable cause existed may be determined as a matter of law on a motion for summary judgment "where there is no dispute as to what facts were relied on to demonstrate probable cause." Walczyk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007).  A court's probable cause inquiry is objective; it

focuses on "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006). Whether a plaintiff was eventually acquitted of the charges against her is not relevant to the probable cause determination. See Michigan v. DeFillippo, 443 U.S. 31, 36 (1979) ("[T]he mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest.").

Ampratwum was arrested on charges of endangering the welfare of a child and unlawful eviction.[13]  Probable cause existed to support Ampratwum's arrest on both counts.  There is no dispute that Vernon contacted the police and informed them that she was sixteen years old and had been kicked out of her home by Ampratwum, her legal guardian.  Ampratwum then refused to allow either Vernon or the police officers to enter the House to retrieve Vernon's belongings, refused to bring Vernon her

---

[13] "A person is guilty of endangering the welfare of a child when . . . [sh]e knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old."  N.Y. Penal Law § 260.10 (emphasis added). An individual is criminally liable for unlawful eviction if she "evict[s] or attempt[s] to evict an occupant of a dwelling unit who has lawfully occupied the dwelling unit for thirty consecutive days or longer . . . [by] engaging or threatening to engage in any other conduct which prevents or is intended to prevent such occupant from the lawful occupancy of such dwelling unit or to induce the occupant to vacate the dwelling unit." N.Y. City Admin. Code § 26-521(a)(3).

belongings, and locked Vernon and the officers out.  In these circumstances, it was reasonable for the officers to rely on Vernon's assertion that she had been kicked out of her home, and to believe that Ampratwum knowingly put Vernon in a situation likely to cause Vernon harm.  See People v. Johnson, 95 N.Y.2d 368, 371 (2000) (liability is not dependent on a showing of "actual harm to the child" but on a showing that "the defendant act[ed] in a manner which is likely to result in harm to the child, knowing of the likelihood of such harm").

Plaintiffs principally argue that the arrest was improper because the defendants refused to speak to ACS case worker Robinson before they arrested her.  They contend that, had the officers called Robinson, she would have confirmed Ampratwum's legal guardianship status as to Vernon and Ampratwum's statement that Vernon had left the House that morning of her own accord. This argument, however, has little merit.  First, no one contested Ampratwum's legal guardian status between the time the officers arrived at the House through the time of Ampratwum's arrest -- both Vernon and Ampratwum repeatedly told the defendants that Ampratwum was Vernon's legal guardian.[14]

In addition, the defendants were under no obligation to conduct further fact-finding prior to arresting Ampratwum.  The

---

[14] The fact of Ampratwum's legal guardianship status is not disputed here.

law does not impose rigid procedural requirements in order for a police officer to conclude that there is probable cause for an arrest.  By contending that the police must conduct a thorough investigation before finding that probable cause exists, the plaintiff conflates the role of law enforcement with that of the judicial system.  "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury.  Their function is to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence."  Finigan, 574 F.3d at 63 (citation omitted).  Ampratwum's repeated protestations that Vernon "ran away" from the House likewise do not suffice to defeat probable cause.  "[T]he fact that an innocent explanation may be consistent with the facts alleged does not negate probable cause," nor does an "officer's failure to investigate an arrestee's protestations of innocence." Panetta v. Crowley, 460 F.3d 388, 395-96 (2d Cir. 2006) (citation omitted).  The defendants' refusal to call or speak to Robinson prior to arresting Ampratwum is therefore of no consequence.[15]

---

[15] Any arguments related to telephone records demonstrating calls to Robinson thus are also of no merit with respect to Ampratwum's arrest.

Insofar as plaintiffs also argue in opposition that the defendants conspired to have Ampratwum unlawfully arrested under either Section 1983 or 42 U.S.C. § 1985, which creates a private right of action against conspiracies to violate civil rights by private actors as well as those acting under color of state law, there is no evidence of a conspiracy. Even when viewed in the light most favorable to plaintiffs, the plaintiffs have merely asserted that the defendants "conspired," in a "self-conspiracy," to cover up the fact that police officers had knocked down the outer door to the House and concealed from one another information about the telephone calls plaintiffs made to 911 and to Robinson. Plaintiffs have not argued nor have they provided any evidence that demonstrates that there was any "meeting of the minds," or "any agreement, express or tacit," to deprive plaintiffs of any constitutionally protected right. See Arar v. Ashcroft, 585 F.3d 559, 569 (2d Cir. 2009); Beechwood Restorative Care Center v. Leeds, 436 F.3d 147, 154 (2d Cir. 2006) (citation omitted) (§ 1983); Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003) (§ 1985); Dahlberg v. Becker, 748 F.2d 85, 93 (2d Cir. 1984) (§ 1983). Plaintiffs' contentions alone amount to no more than conclusory allegations unsupported by any evidence, and are insufficient to defeat summary judgment in favor of defendants on plaintiffs' false arrest claim.

22

C.  Malicious Prosecution

Plaintiffs' Complaint is also construed to seek relief under Section 1983 based on claims of malicious prosecution as to the State Criminal Action against Ampratwum and the ACS proceedings against Ampratwum and Fisher.  "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and establish the elements of a malicious prosecution claim under state law."  Roberts v. Babkiewicz, 582 F.3d 418, 420 (2d Cir. 2009) (per curiam) (citation omitted).  "Malicious prosecution occurs when (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice, and (4) the matter terminated in plaintiff's favor."  Cameron v. City of N.Y., 598 F.3d 50, 63 (2d Cir. 2010) (citation omitted).  In the context of a malicious prosecution claim, probable cause refers to "such facts and circumstances as would lead a reasonably prudent person to believe the plaintiff guilty."  Boyd v. City of N.Y., 336 F.3d 72, 76 (2d Cir. 2003).  "The absence of probable cause is an essential element of a claim for malicious prosecution" under New York law, McClellan v. Smith, 439 F.3d 137, 145 (2d Cir. 2006), and the plaintiffs bear the burden of proving "that there was no probable cause for the criminal charge[s]" on which

they were prosecuted.  Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004).

Plaintiffs' malicious prosecution claims fail for several reasons.  First, both Ampratwum's prosecution on charges of endangering the welfare of a child, unlawful eviction, and harassment, and the proceedings against plaintiffs in family court, although both ultimately dismissed, were supported by probable cause.  The actions were filed as a result of interviews with Vernon, who told a prosecutor and an ACS investigator that she had been living with Ampratwum as her guardian for two years, that Ampratwum threw her out of the House and refused to allow her to collect her belongings, and that Fisher smoked marijuana around her and the younger children living in the House.  The State Criminal Action complaint also states that Ampratwum told Vernon she was "going to burn [her] stuff" and that Vernon feared for her safety.  Plaintiffs have not argued that any new evidence came to light that caused the probable cause leading to these actions to dissipate.  "In order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact."  Kinzer v. Jackson, 316 F.3d 139, 144 (2d Cir. 2003) (citation omitted).  Without any evidence supporting the vitiation of probable cause, there can be no deprivation of

24

any constitutional right, and therefore no claim under Section 1983.

Plaintiffs' malicious prosecution claims also fail with respect to the elements of initiation and malice.  To constitute initiation, "it must be shown that defendant played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act."  Rohman v. New York City Transit Auth., 215 F.3d 208, 217 (2d Cir. 2000) (citation omitted).  Notably, there is no evidence that the remaining defendants personally played an active role in the State Criminal Action or ACS proceedings.[16]  Ampratwum claims that the defendants arrested her and broadly alleges that the defendants conspired to bring the State Criminal Action charges against her in order to cover up police misconduct.  The plaintiffs, however, do not offer any evidence linking those allegations with any acts of the defendants that could be construed as "initiating" or encouraging the State Criminal Action or ACS proceedings.

---

[16] Plaintiffs' claim that defendant Enmanuel forged Vernon's signature on the State Criminal Action complaint is unsupported by evidence.  Vernon recalls speaking with a prosecutor the day after the events at issue, and knew that criminal charges had been filed.  That Ampratwum testified that it did not look like Vernon's signature is not determinative.  Absent other evidence, this claim must be rejected.  Moreover, neither the state prosecutor nor Vernon is a defendant in this action.  Any claims as to their misconduct have no bearing on plaintiffs' malicious prosecution claim here.

Finally, the plaintiffs also fail to demonstrate malice, which requires showing "a wrong or improper motive, something other than a desire to see the ends of justice served." <u>Fulton v. Robinson</u>, 289 F.3d 188, 198 (2d Cir. 2002). Plaintiffs have adduced no such evidence from which a "wrong or improper motive" could be inferred. The fact that the charges against Ampratwum and Fisher were ultimately dropped in both actions does not in itself demonstrate that the proceedings were brought for any "wrong or improper" purpose. As described above, to the extent that the plaintiffs argue that these proceedings were grounded either on falsified police records or on a conspiracy among defendants, these allegations consist only of "mere conjecture and surmise" without evidence pointing to any conspiracy. These unsupported allegations would not cause a reasonable jury to find that either action was filed as a result of conduct undertaken in bad faith. Accordingly, plaintiffs' claim for malicious prosecution is dismissed.

D. First Amendment Retaliation

Plaintiffs' false arrest or malicious prosecution claims can also be construed to allege that Ampratwum was arrested and prosecuted in retaliation for seeking to file a complaint against police officers in violation of the First Amendment. This claim is also dismissed.

The factual circumstances underlying plaintiffs'
retaliation claim, particularly the timing of Ampratwum's
arrest, leave room for pause.  Ampratwum was not arrested at the
House after engaging in a verbal dispute with police officers,
refusing to let Vernon collect her belongings, and, according to
police reports, slamming and locking the outer door of the House
on officers Enmanuel and Vargas.  Instead, it was only after
Ampratwum went to the police station and attempted to file
complaints against the police officers that Kelly informed her
that there had been a "change of plans," and she was arrested.
Other than the fact that Kelly did not speak to Robinson at
plaintiffs' request, the record contains no evidence of events
or conversations among defendants that occurred in the time
between Ampratwum's first request to file complaints against the
police officers and her arrest.  Nonetheless, any retaliation
claim must fail because probable cause existed to support
Ampratwum's arrest and prosecution.

The existence of probable cause will defeat a First
Amendment retaliation claim premised on allegations that the
defendants arrested or prosecuted a plaintiff "out of
retaliatory motive, in an attempt to silence her."  Fabrikant v.
French, 691 F.3d 193, 215 (2d Cir. 2012).  If an officer had
probable cause, a court "will not examine the officer's
underlying motive in arresting and charging the plaintiff."

Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 120 (2d Cir. 1995).

Similarly, "[a]n individual does not have a right under the

First Amendment to be free from a criminal prosecution supported

by probable cause, even if that prosecution is in reality an

unsuccessful attempt to deter or silence criticism of the

government."  Fabrikant, 691 F.3d at 215 (citation omitted); see

also Mozzochi v. Borden, 959 F.2d 1174, 1179-80 (2d Cir. 1992)

("[B]ecause there was probable cause in this case to believe

[the plaintiff] violated the . . . statute, we will not examine

the defendants' motives in reporting [plaintiff's] actions to

the police for prosecution.").

Here, it has already been determined that the undisputed

evidence supports the existence of probable cause as to both

Ampratwum's arrest and any judicial proceedings conducted

against Ampratwum and Fisher.  Summary judgment is therefore

granted in favor of defendants with respect to plaintiffs' First

Amendment retaliation claim.

E.  Unlawful Entry

Plaintiffs' Complaint is also construed to raise a claim of

unlawful entry under the Fourth Amendment based on Enmanuel and

Vargas "kicking down the plaintiff's door" and entering the

hallway outside Ampratwum's apartment door.  "The Fourth

Amendment protects the right of private persons to be free from

unreasonable government intrusions into areas where they have a

legitimate expectation of privacy." United States v. Snype, 441 F.3d 119, 130 (2d Cir. 2006) (citation omitted). Absent an exception such as consent, "the police must obtain a warrant before they enter a home to conduct a search or otherwise intrude on an individual's legitimate expectation of privacy." United States v. Gori, 230 F.3d 44, 50 (2d Cir. 2000).[17] Thus, the "touchstone" of a Fourth Amendment inquiry is whether "a reasonable expectation of privacy" exists in the area claimed to be protected by the Fourth Amendment. United States v. Titemore, 437 F.3d 251, 259 (2d Cir. 2006).

Ampratwum testified that no officers ever entered into her apartment space. Thus, the question here is whether Ampratwum had a reasonable expectation of privacy in the common hallway outside her apartment door. She did not. A privacy expectation "has reference to a place and will be violated only if the place is one that the [individual] has the right to keep private and subject to his exclusive control." United States v. Holland, 755 F.2d 253, 255 (2d Cir. 1985) (citation omitted). Although

---

[17] An exception is made "when the search is conducted pursuant to the consent of an authorized person," Snype, 441 F.3d at 130, so long so long as that consent is "voluntarily given." Schneckloth v. Bustamonte, 412 U.S. 218, 223 (1973). Accordingly, no unlawful entry claims are construed as to Jiminez because Ampratwum states that she voluntarily opened the outer door for Jiminez for purposes of speaking with him, and because the plaintiffs do not assert that Jiminez entered either the House or Ampratwum's apartment without consent.

apartments have been considered "homes" with an expectation of privacy for Fourth Amendment purposes, the Supreme Court "has never given the same status to adjoining common hallways." Id. Instead, "it is the established law of [the Second] Circuit that the common halls and lobbies of multi-tenant buildings are not within an individual tenant's zone of privacy even though they are guarded by locked doors." Id.; see also United States v. Barrios-Moriera, 872 F.2d 12, 14 (2d Cir. 1989), abrogated on other grounds, 496 U.S. 128 (1990) (holding a warrantless search is permissible in "a common hallway . . . where there is no legitimate expectation of privacy . . . even though the area was guarded by a lock."). There is no requirement for any "amount of daily traffic through the area as a basis for determining that a common area is beyond an individual's protected zone of privacy." Holland, 755 F.3d at 256.

Ampratwum describes the space in the hallway between the outer door and her apartment door as "very close," roughly "two, [or] three feet." Ampratwum shares access to the hallway with her landlord, who owns the house, lives in the second floor apartment, and to whom Ampratwum pays rent. Both Ampratwum and her landlord, and members of the landlord's family who do not reside at the House have keys to the outer door, and "come and go" as they please. Ampratwum's apartment is accessed through a second locked door off the hallway. Although Ampratwum and the

landlord have keys to one anothers' apartments, they generally do not enter the other's apartment without permission. Plaintiffs do not contend that they consider the hallway to be part of Ampratwum's apartment.  Accordingly, the hallway was a common space affording no reasonable expectation of privacy. Enmanuel's and Vargas' forced entry into the hallway through the outer door thus did not violate any protected privacy interest. Plaintiffs' unlawful entry claim is therefore dismissed.[18]

F.  Due Process Violations

Plaintiffs contend that Enmanuel and Vargas unlawfully damaged their personal property by kicking down the outer door to the House, that the defendants failed to provide Ampratwum with police reports and 911 emergency call records that she sought through FOIL requests, and that ACS proceedings improperly prevented Fisher from enjoying unsupervised visitation with A.A. and F.F and required him to submit to drug screening.  Each of these allegations is construed as a claim that plaintiffs were deprived of property or liberty without due process of law.

As an initial matter, the plaintiffs have not demonstrated that any of the remaining defendants were personally involved in

---

[18] Because there was no reasonable expectation of privacy in the hallway, it is unnecessary to consider plaintiffs' arguments regarding exigent circumstances or any "special relationship" status created by Ampratwum's calls to Robinson.

the decisions to order Fisher to take a drug test or to place
conditions on his visitation with A.A. and F.F.   Those decisions
were made based on interviews with Vernon and neglect petitions
and an investigation conducted by Campbell, and following a
proceeding held in Family Court in front of Judge Roberts.
Accordingly, Fisher's claim is dismissed.   Farid, 593 F.3d at
249.

        "In evaluating due process claims, the threshold issue is
always whether the plaintiff has a property or liberty interest
protected by the Constitution." Perry v. McDonald, 280 F.3d
159, 173 (2d Cir. 2001) (citation omitted).   "If a protected
interest is identified, a court must then consider whether the
government deprived the plaintiff of that interest without due
process." Id. (citation omitted); see Ciambriello v. Cnty. of
Nassau, 292 F.3d 307, 313 (2d Cir. 2002).   "[P]ostdeprivation
remedies made available by the State can satisfy the Due Process
Clause." Parratt v. Taylor, 451 U.S. 527, 538 (1981), overruled
on other grounds, Daniels v. Williams, 474 U.S. 327 (1986).
While there is no requirement under Section 1983 that state
remedies be exhausted before suit can be filed in federal court,
see Hellenic Am. Neighborhood Action Comm. v. City of N.Y., 101
F.3d 877, 881 (2d Cir. 1996), the availability of an adequate
post-deprivation remedy will defeat a procedural due process
claim brought pursuant to Section 1983.   Id.

Defendants are entitled to summary judgment with respect to plaintiffs' remaining due process claims.  First, there is no evidence that Ampratwum has a property interest in the outer door to the House.  Ampratwum does not own the House.  Instead, Ampratwum's landlord is -- and was in 2009 -- the owner of the House, and Ampratwum pays rent to the landlord to live in her first-floor apartment.  It has already been determined that Ampratwum had no privacy interest in the outer door area, and no evidence suggests that Ampratwum has any property interest in the outer door either.  Cf. CSC Holdings, Inc. v. Westchester Terrace at Crisfield Condominium, 235 F.Supp.2d 243, 247 n. 1 (S.D.N.Y. 2002) ("the owner of a multiple dwelling building has control of the common areas").

Regardless of whether Ampratwum has a property interest in the outer door, however, the plaintiffs were afforded adequate post-deprivation procedures to satisfy the Fourteenth Amendment's due process requirement.  Where a plaintiff alleges an "unauthorized intentional deprivation of property by a state employee[, there is no] violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984); Rivera-Powell v. New York City Bd. Of Elections, 470 F.3d 458, 465 (2d Cir. 2006) ("When the state conduct in question is random and unauthorized,

33

the state satisfies procedural due process requirements so long as it provides meaningful post-deprivation remedy.").

Here, causing damage to the outer door was a "random" act, see id. at 465-66, and as previously noted, plaintiffs do not allege that any deprivation of their rights -- including damage to the outer door -- occurred pursuant to any established policy.  Plaintiff also does not allege, nor is there any evidence in the record, that available post-deprivation remedies under state law were in any way inadequate.  See Alfaro Motors, Inc. v. Ward, 814 F.2d 883, 888 (2d Cir. 1987); see, e.g., Cornett v. Brown, No. 04 CV 0754 (DGT) (LB), 2006 WL 845568, at *16 (E.D.N.Y. Mar. 30, 2006) (dismissing plaintiff's Section 1983 claim against the city and individual defendants for deprivation of property without due process because post-deprivation remedies "such as replevin and trespass to chattels . . . were available under state law"); Smith v. City of New York, No. 03 Civ. 7576 (NRB), 2005 WL 1026551, at *8 (S.D.N.Y. May 3, 2005) ("It is well established that New York provides . . . the opportunity for a meaningful postdeprivation hearing by way of state law causes of action for negligence, . . . or conversion which could fully compensate the plaintiff for his alleged property loss." (citation omitted)); Carter v. Kress, No. 83 Civ. 1225, 1985 WL 100, at *1 (S.D.N.Y. Oct. 10, 1985) ("If property is taken by the police . . . and not voluntarily

returned to an arrestee, the property owner has two adequate post-deprivation remedies under New York law: a common-law . . . action or, after demand, a proceeding under Article 78 of the [New York Civil Practice Law and Rules].").

With respect to plaintiffs' FOIL claims, the plaintiffs do not have a property interest in obtaining documents under FOIL. See Papay v. Haselhuhn, No. 07 Civ. 3858 (LAP), 2010 WL 4140430, at *7 (S.D.N.Y. Oct. 21, 2010); O'Bradovich v. Village of Tucahoe, 325 F.Supp.2d 413, 432 (S.D.N.Y. 2004). FOIL documents are not produced as of right but only after requests and investigation by the state entity. See N.Y. Pub. Off. Law §§ 84-89. A plaintiff therefore has only an expectation of receipt of such documents. See O'Bradovich, 325 F.Supp.2d at 432-33. Because plaintiffs have no property interest in the FOIL documents, the defendants' failure to provide the requested documents does not constitute a violation of plaintiffs' constitutional rights.

Even if plaintiffs had a constitutionally protected interest in obtaining documents pursuant to FOIL, their due process claim would still fail. New York's Article 78 procedures constitute an adequate post-deprivation remedy for an alleged FOIL violation. See Harris v. Mills, 572 F.3d 66, 76 (2d Cir. 2009); Rivera-Powell, 470 F.3d at 466. As a result, plaintiffs' due process claims are dismissed.

G.   State Law Claims

Finally, plaintiffs' Complaint is construed to allege claims for "property damage," false arrest, false imprisonment,[19] and fraud under state law against the remaining defendants. Each of these claims is also dismissed.

First, any state law cause of action arising from damage caused when Enmanuel kicked in the outer door to the House -- whether construed as a claim for conversion or trespass to chattels -- is barred by the applicable statute of limitations. Claims against the City and its employees for damage to property arising out of acts committed within the scope of their employment must "be commenced within one year and ninety days after the happening of the event upon which the claim is based." Gen. Mun. L. § 50-i(1)(c); see Ruggiero v. Phillips, 292 A.D.2d 41, 44 (N.Y. 4th Dep't 2002); Pileckas v. Trzaskos, 511 N.Y.S.2d 438, 438 (3d Dep't 1987).  There is no dispute that Enmanuel was acting within the scope of her employment when she forced open the outer door.  Plaintiffs' claim accrued when the alleged damage occurred, on July 20, 2009.  Plaintiffs' claim had thus expired by the time they filed the Complaint on August 31, 2011.

Plaintiffs' state law claims for false arrest and false imprisonment also fail.  Under New York law "the tort of false

---

[19] Plaintiffs state a cause of action for "misprison," which is construed as a claim of false imprisonment.

arrest is synonymous with that of false imprisonment." Posr v.
Doherty, 944 F.2d 91, 96 (2d Cir. 1991).  Claims for false
arrest brought under Section 1983 are substantially the same as
a state law claim for false arrest, Jocks v. Tavernier, 316 F.3d
128, 134 (2d Cir. 2003), and as is the case with Section 1983
claims, probable cause is an affirmative defense.  Broughton v.
State, 37 N.Y.2d 451, 458 (1975).  Because the defendants had
probable cause to arrest Ampratwum, summary judgment is proper
in favor of the defendants on both plaintiffs' false arrest and
false imprisonment state law claims.

Finally, to state a claim of fraud under state law, the
plaintiffs must demonstrate that: "(1) a misrepresentation or a
material omission of fact which was false and known to be false
by defendant, (2) made for the purpose of inducing the other
party to rely upon it, (3) justifiable reliance of the other
party on the misrepresentation or material omission, and (4)
injury." Premium Mortg. Corp. v. Equifax, Inc., 583 F.3d 103,
108 (2d Cir. 2009) (per curiam) (citation omitted).  Plaintiffs
broadly assert that defendants fraudulently falsified police
reports and made false statements regarding the events of July
20, 2009.  In particular, the plaintiffs allege that there are
inconsistencies in the police reports that they received during
discovery in the State Civil Action, and that the police reports
falsely claim that Ampratwum kicked Vernon out of the House.

Plaintiffs also contend that Enmanuel falsified the police domestic incident report, which states that Ampratwum was arrested -- "Arrest Made: YES" -- but also lists the "Time of Report" as "1444," or 2:44 p.m., whereas Ampratwum was arrested later, at 4:15 p.m.

Whether or not the incorrect entry of Ampratwum's arrest time or the statements as to why Vernon left the House are material, plaintiffs have not provided any evidence demonstrating that the statements were made to induce reliance by plaintiffs or that any reliance occurred.  Merely characterizing behaviors as "fraud," will not support a fraud claim.  Plaintiffs' claims asserting fraud under state law are therefore dismissed.

III. Motion to Strike

 Plaintiffs have also moved to strike portions of the affidavit defendant Enmanuel submitted in support of defendants' motion for summary judgment.  They claim that the affidavit contains "willful fraud" in that it omits "legal facts" regarding Enmanuel's conduct at the House.  In particular, plaintiffs point to the fact that Enmanuel's affidavit does not indicate that Enmanuel kicked in the door, but instead states that she "entered the hallway outside Ms Ampratwum's apartment." The parties do not contest, however, that Enmanuel forced open

the outer door of the House -- after Ampratwum had locked it -- to enter the hallway.  That this undisputed fact was omitted from the affidavit does not suggest that the document contains information that is in any way "redundant, immaterial, impertinent, or scandalous" under Rule 12(f), Fed. R. Civ. P., or that it is unfairly prejudicial to plaintiffs.  Plaintiffs' motion to strike is therefore denied.


                            CONCLUSION

     The defendants' January 8, 2013 motion for summary judgment is granted.  The plaintiffs' January 2 and January 4, 2013 motions for summary judgment are denied.  The plaintiffs' February 1 motion to strike is also denied.  The Clerk of Court shall enter judgment for the defendants and close the case.


          SO ORDERED:

Dated:     New York, New York
           May 9, 2013

                            _____
                            DENISE COTE
                            United States District Judge

39

COPIES MAILED TO:


Tashena Ampratwum
3051 Gunther Avenue
Bronx, NY 10469

Eric Fisher
1173 East 229 St Drive North, (3A)
Bronx, NY, 10466